IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TAMMY ANNE LASHER,

                Plaintiff,

v.

NANCY A. BERRYHILL,
Deputy Commissioner of Social Security,

                Defendant.

OPINION AND ORDER

16-cv-267-wmc

---

Claimant Tammy Anne Lasher seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Deputy Commissioner of Social Security, under 42 U.S.C. § 405(g), which denied her application for disability and disability insurance benefits. Claimant argues that four failures of the ALJ necessitate remand: (1) failing to evaluate properly plaintiff's mental impairment; (2) failing to evaluate properly the treating psychologist's opinion; (3) failing to substantially support his RFC finding; and (4) failing to evaluate and weigh properly plaintiff's statements regarding the limiting effects of her symptoms. Because the ALJ failed to obtain and consider updated state agency physician opinions -- particularly in light of claimant's late-disclosed 2012 neuropsychological evaluation and its possible impact on the weight due to her treating physician's opinion -- the Commissioner's decision will be reversed and remanded for further proceedings.

BACKGROUND

Lasher filed a Title II application seeking disability and disability insurance benefits on April 11, 2013. (AR 33.) Initially, she alleged a disability onset date of July 1, 2011, but then she amended that to January 3, 2012. (AR 33, 41.) Last insured on December

31, 2012, she previously worked as an industrial cleaner, orthodontic tech, medical clerk, and housekeeping cleaner. (AR 39.) Lasher appears to have been in special education classes while in school (AR 81), although her Disability Report Form states that she was not (AR 210). She also attempted to attend trade school, but dropped out before receiving a certified nursing assistant certification. (AR 82-83, 97.)

She last worked at a part-time job in 2015, two weekends a month for a few months; before that she worked in 2010 as a cleaning attendant in a casino. (AR 84-85.) She stopped working because of her "spells," "anxiety[ and] palpitations," and low blood pressure. (AR 85.) She did not return to work because of "mental and emotional problems." (AR 86.)

### A. Medical Records and Reports[1]

Claimant's medical records begin in January 2012, with a note by Dr. Patricia Reiff recognizing that claimant had "been having trembles that start at her leg then her whole body," as well as "[s]eizure like activity." (AR 279.) Dr. Tracy Chiem's note from May 2012 provides more background, explaining that for the past two and a half years claimant

> would suddenly feel lightheaded and feel like she would collapse and would grab onto something. Occasionally, these episodes would lead to patient passing out for 5-10 mins but has never injure[d] herself. Patient denies tongue biting or urinary incontinence. Occasionally, during the lightheadedness, she recalls having palpitations and turning pale but denies diaphoresis. . . . Occasionally, these episodes are also associated with shaking of her legs and arms . . . . She

---

[1] The bulk of claimant's medical records are dated after she was last insured, and many pieces do not seem to relate to her condition even before her last insured date. For instance, much of her file relates to a custody battle with her ex-husband in 2013-2015. The court will focus only on the records before her last insured date *and* those otherwise relevant to her appeal.

> has a black out spell once every 2 weeks, however, she had 2 events this week.

(AR 290.) However, Chiem's review of symptoms also notes that claimant had "no seizure[s]," as well as "no depression, no anxiety, no memory lapses or loss." (AR 291.) Complicating this note even more, Chiem lists "History of Partial Complex Psychomotor Seizure With Intractable Seizure," which is categorized as "Resolved." (*Id.*)

In July 2012, claimant was admitted by the Barrow Neurological Institute at St. Joseph's Hospital and Medical Center for "evaluation of epileptic vs. non-epileptic spells." (AR 523.) At that time, she reported episodes of near-syncope three or four times a week. (*Id.*) She was evaluated from July 23-28, 2012 and had one "event," which involved claimant feeling shaky and having muffled hearing. (*See* AR 524-25.) Neuropsychological testing performed on July 23, 2012, "was remarkable for mild to moderate impairment in memory . . . and language," with the findings "observed in the context of borderline intellectual functioning." (AR 526.) The results were also deemed to be "consistent with the patient's history of learning difficulties and special educational needs"; in addition, "[o]bjective measures of personality raise[d] concern for possible conversion disorder." (*Id.*) Her intellectual functioning was rated as follows: "VCI = 63 (extremely low range)"; "PRI = 75 (borderline range)"; and "FSIQ = 71 (borderline range)." (*Id.*). Her past job was listed as a "Casino Housekeeping manager," and noted she left it "due to the syncopal events and associated 'heart condition.'" (AR 523.)

In December 2012, claimant's last insured date, Dr. Reiff noted that claimant's seizures were happening "more often." (AR 278.) During this time period, her only systemic medication was Albuterol Sulfate Hfa -- an inhaler. (AR 256, 296.) By 2013, she

was also taking anxiety medication, and lorazepam, among other medications. (AR 284, 322.) In 2014, claimant's "general cognitive functioning appeared to be in the average range," and her "[f]und of knowledge and abstract thinking were commensurate with her average cognitive functioning." (AR 468.)

Claimant began seeing Dr. DeLeana Strohl in December 2014 for "help in managing her depression and anxiety over a custody battle." (AR 507.) On the intake form, Strohl noted that claimant reported using special education services in school and thinking she had a learning disorder, as well as prior employment "as a CNA and orthodontist specialist," and in housekeeping. (AR 509.) In March 2015, Strohl believed claimant should "seek[] a definitive answer about her potential cognitive impairment via a neuropsych eval." (AR 515.) When asked to complete a form to aid claimant's disability insurance application in April 2015, Strohl noted that claimant "is convinced she is unable to work secondary to some neurological impairment and/or head trauma" and "reported that her anxiety and depression also interfere with her abilities." (AR 516.)[2] Strohl believed that claimant "need[ed] a functional capacity exam or vocational evaluation" to complete the second page of the form. (AR 517.)

Dr. Strohl completed a supplemental questionnaire as to residual functional capacity in June 2015. (AR 521-22.) She opined that claimant had "slight" limitations in her ability to "[u]nderstand and remember short, simple instructions" and to "[c]arry out short, simple instructions," as well as "slight" to "moderate" limitations in her ability "to

---

[2] Dr. Strohl also noted that "[p]erhaps more confusing was [claimant's] comments about her inability to work at all as she expressed a desire to find out why she was fired and to see if she can get her job back." (AR 517.)

make judgments on simple work-related decisions" depending on her stress. (AR 521.) Strohl added that claimant had "moderate" limitations in her ability to: (1) "[i]nteract appropriately with the public"; (2) "[i]nteract appropriately with supervisors"; (3) "[i]nteract appropriately with co-workers"; (4) "[r]espond appropriately to work pressures in a usual work setting"; and (5) "[r]espond appropriately to changes in a routine work setting." (*Id.*)  She further opined that claimant would be: (1) off task 15% of the time; (2) absent an average of 2 days per month; (3) unable to complete an eight-hour work day twice a month; and (4) able to "perform a job 8 hours per day for 5 days a week on a sustained basis" 80% of the time based on mental limitations. (AR 522.) Strohl qualified her opinion by adding that determining "the total extent of Tammy's impairment would require a vocational assessment or a functional capacity examination and/or a neuropsychological examination." (*Id.*)

### B. ALJ's Decisions

In his first decision, the ALJ concluded that claimant had two severe impairments: seizure disorder and asthma. (AR 35.) Giving "great weight" " to the state agency medical consultants' opinions, the ALJ found "no evidence of a mental impairment," even though claimant alleged that she was an anxiety sufferer, and found no "physical impairment that meets or equals one of the listed impairments." (*Id.*) The ALJ also found that the claimant could "perform light work" with exceptions:

> she can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand, walk and sit about 6 hours respectively; is precluded from climbing ropes, ladders and scaffolding; should avoid more than occasional exposure to extremes in temperature and humidity as well as fumes, dust, odors, gases

> and poorly ventilated areas as well as hazards; routine tasks requiring no more than a reasoning development level of 3 on the DOT's GED scale, that allows for being off task at the assigned work station up to 10% of the work day in addition to regular breaks; no more than occasional interaction with the public and supervisors; that does not involve fast paced or production rate tasks; and has few, if any, work place changes.

(AR 36-37.) The ALJ further found the claimant to be "only partially credible," imposing additional restrictions based on her testimony of nonsevere physical impairments and reports of psychiatric impairments. (AR 38.) Similarly, the ALJ found that Dr. Strohl's opinion warranted "little weight" because it postdated the claimant's date last insured. (*Id.*)

As of claimant's date last insured, therefore, the ALJ ultimately found that the claimant could perform her past relevant work, specifically as a housekeeping cleaner, and that other jobs existed in significant numbers in the national economy that the claimant could perform, such as office helper, industrial helper, and bench assembler. (AR 39-40.) Accordingly, the ALJ concluded that "[t]he claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2011, the alleged onset date, through December 31, 2012, the date last insured." (*Id.*)

The ALJ issued his decision on June 18, 2015. (AR 41.) That same day, he received a report from the Barrow Neurological Institute relating to the claimant's neuropsychological evaluation in July 2012 that had previously been omitted from the record. (AR 27.) On June 22, 2015, he issued an amended decision, concluding that "the decision of June 18, 2015, remains unchanged." (AR 29.) Addressing the July 2012 testing, the ALJ noted that claimant's MRI and EMG were normal and that continuous EEG

monitoring revealed "no interictal epileptiform discharges" over a period of five days and nights. (AR 28.) The ALJ noted one episode where the claimant reported having a seizure, but failed to hit the "event" button. (*Id*.) Moreover, he noted that the claimant was observed as alert and oriented despite complaining of "muffled hearing" and "shakiness." (*Id.*) The ALJ added that:

> The validity of the results of the WAIS-IV testing was not indicated, and while not inconsistent with her reported issues with learning difficulties and special education involvement, the objective measures of personality however raised concerns about the possibility of a conversion disorder, which the undersigned interprets as raising some doubt as to validity.

(*Id.*)

While claimant's counsel had argued that the test results showed claimant's disability matched listing 12.05C, the ALJ disagreed as there was no earlier testing available to compare, and the listing required "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, that is prior to age 22." (AR 28.) Here, the claimant could not meet this definition because her employment after the age of 22, including as a medical clerk, housekeeping manager, and orthodontic technician, all involved skills and responsibilities exceeding "what one would expect with cognitive functioning at the reported and alleged levels." (*Id.*)

OPINION

While the claimant raised four arguments for remand, most are rooted in the ALJ's treatment of her 2012 neuropsychological evaluation. Because the ALJ cannot play doctor

7

and determine the 2012 testing's import without the aid of expert medical testimony, which he did not seek or obtain before issuing his amended opinion, the claimant's application must be remanded for further consideration.

First, claimant argues that the ALJ failed to evaluate her mental impairment properly for a handful of reasons, including: (1) continuing to rely on the state agency physicians' opinions despite their not reviewing the late-submitted, additional neuropsychological evaluation; (2) failing to get updated opinions from the state agency physicians on listings and medical equivalence in light of that evaluation; and (3) "repeatedly play[ing] doctor and substitut[ing] his layman's guesses for substantial evidence" in reviewing the results of the neuropsychological testing.[3] (Dkt. #9 at 16-18.) The government's responses to these criticisms fall flat. As an initial matter, the government contends that the state agency physicians' opinions provide significant evidence supporting the ALJ's decision, and the ALJ "more than accounted for the[ir] restrictions," including "[g]iving Plaintiff the benefit of the doubt" and incorporating "mental restrictions in [the] RFC finding." (Dkt. #14 at 10-11.) However, this simply misses the point. The ALJ continued to rely on opinions by state agency physicians, who did not have *all* of claimant's medical records in front of them, effectively leaving open the question whether the late-produced neuropsychological evaluation would have changed their opinions. *See Guest v. Colvin*, No. 15 C 2843, 2016 WL 2987001, at *4 (N.D. Ill.

---

[3] Claimant argues that the ALJ's questioning of her low IQ score based on the possible effects of a conversion disorder was an opinion that the ALJ was not qualified to give. (Dkt. #15 at 2.) She also argues that the government's reliance on the possible conversion disorder is inconsistent: "the ALJ gave the opinion that the IQ testing might not be valid due to a conversion disorder[, y]et, Defendant argues there was no proof of a conversion disorder." (*Id.* at 7.)

May 24, 2016) (evidence of worsening symptoms after the state agency physician's assessment "might reasonably impact his opinion regarding [claimant's] limitations" and faulting the ALJ for relying on a state agency physician's opinion that "was not based on a complete review of all the relevant medical evidence").

The government also argues that the ALJ correctly determined the claimant did not meet Listing 12.05C because her below-70 IQ score is only one of the required elements; she also needed to show "deficits in adaptive functioning manifested before age 22," which again she could not establish having held semi-skilled work after age 22. (*Id.* at 12-13.) To this, claimant responds that (1) her "low IQ is a lifelong condition, existing both before the date last insured *and* before the age of 22" and (2) she established the existence of adaptive functioning deficits before turning 22, which presented as learning difficulties and placement in special education classes. (Dkt. #15 at 2-3.)[4] This is likewise a question on which medical testimony in light of the July 2012 report would be helpful. Accordingly, remand is necessary.

Second, claimant argues that the ALJ failed to give controlling weight to the opinions of her treating physician, DeLeana Strohl, Ph.D., which were supported by and not inconsistent with other record evidence. (Dkt. #9 at 18.) The ALJ explained that he gave Strohl's opinions little weight because they came after claimant's last-insured date. However, the claimant argues this required the ALJ to ignore the 2012 neuropsychological

---

[4] Claimant also argues that as of January 17, 2017, the Listing 12.05C ceased to exist and that the regulations governing mental disorders were otherwise revised concerning how the Social Security Administration considers prior work activity and evidence showing onset before the age of 22. (Dkt. #15 at 4-5.)

9

evaluation, which pre-dated the last date she was insured, and Strohl opined would be needed to determine "the total extent of [claimant's] impairment." (*Id.* at 19.)

In response, the government repeats the ALJ's contention that he appropriately determined Strohl's opinions were "too remote from the relevant period to warrant controlling or great weight," faulting the claimant for failing to establish Strohl's limitations were valid during the relevant period. (Dkt. #14 at 11.) Further, the government contends, claimant has not established that Dr. Strohl's opinions are "consistent with or supported by the evidence from the relevant period," nor does she "explain how [the July 2012 report] would support Dr. Strohl's off-task, efficiency, and tardiness restrictions." (*Id.* at 12.)

Whether a timely neuropsychological evaluation should influence the weight assigned to Strohl's opinions is a question that obviously requires medical testimony; it is not something that the ALJ or this court can determine alone. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor. The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Commonsense can mislead; lay intuitions about medical phenomena are often wrong."). One again, therefore, remand is required.

Third, claimant argues that the ALJ did not properly evaluate and weigh her statements about the limiting effects of her symptoms. More specifically, claimant argues

that the Social Security Administration's new SSR 16-3p (which became effective March 16, 2016) instead of SSR 96-7p (which was effective at the time of the ALJ's decision) should apply because the current regulation clarifies that an ALJ's evaluation of a claimant's objective symptoms was improper because the ALJ "played doctor" by making his own medical findings. (Dkt. #9 at 22-25.) The government does not address this contention. Despite a regulatory interpretation by the Social Security Administration that is arguably to the contrary,[5] claimant appears correct that SSR 16-3p -- not SSR 96-7p – applies on review. *See Mendenhall v. Colvin*, No. 3:14-CV-3389, 2016 WL 4250214, at *2-*4 (C.D. Ill. Aug. 10, 2016) (finding that the retroactive application of SSR 16-3p was required).[6] However, the court need not reach this issue because the ALJ's handling of the late-disclosed 2012 neuropsychological evaluation already necessitates remand. Likewise, the court need not address claimant's argument that the vocational expert relied on by the ALJ

---

[5] "When a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the rules that were in effect at the time we issued the decision under review." *Social Security Ruling 16-3p Titles II and XCI: Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49,462, 49,468 n.27 (Oct. 25, 2017).

[6] Other courts have gone both ways on the retroactive application of SSR 16-3p. *See Mendenhall*, 2016 WL 4250214, at *3 (citing cases from the Middle District of North Carolina, the District of Connecticut, and the Eastern District of Tennessee rejecting retroactive application and cases from the Northern District of Illinois, the Northern District of Indiana, the District of Maryland, and the District of Oregon that favor it). In one opinion, the Seventh Circuit noted that

> The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.

*Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). While this does not require retroactive application, it supports *Mendenhall*'s reading of SSR 16-3p as a clarification, rather than a retroactive change in law.

11

was not fully-informed, thereby making the RFC inadequately supported.

ORDER

Accordingly, IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Deputy Commissioner of Social Security, denying claimant Tammy Lasher's application for disability and disability insurance benefits is REVERSED AND REMANDED. The clerk of court is further directed to enter judgment for claimant Tammy Lasher and close this case.

Entered this 16th day of July, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge